IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

MICHAEL APONTE-PINTO,
      Petitioner,

vs.                         Case No.:  3:18cv443/LAC/EMT

WARDEN WOODS, et al.,
      Respondents.
_____/

## REPORT AND RECOMMENDATION

This cause is before the court on Petitioner Michael Aponte-Pinto's ("Aponte-Pinto") petition for writ of habeas corpus, filed pursuant to 28 U.S.C. § 2241 (ECF No. 1).  Aponte-Pinto is an inmate of the federal Bureau of Prisons ("BOP"), currently housed at the Federal Prison Camp in Pensacola, Florida ("FPC-Pensacola"). Respondent Woods, the Warden of FPC-Pensacola, filed a Response to the § 2241 petition with supporting materials (ECF No. 11).  Aponte-Pinto filed a pro se Reply with supporting materials (ECF No. 13).  Counsel for Aponte-Pinto filed a notice of appearance (ECF No. 15) and a Supplemental Reply (ECF No. 16).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C).  After careful consideration of the issues presented by the parties, it is the opinion of the

undersigned that no evidentiary hearing is required for the disposition of this matter. It is further the opinion of the undersigned that the pleadings and attachments before the court show that Aponte-Pinto is not entitled to relief.

## I.    BACKGROUND

The parties do not dispute the following background facts (*see* Respondent's Response at 2–5, ECF No. 11; Aponte-Pinto's Reply at 5–8, ECF No. 13).  Aponte-Pinto was convicted in the United States District Court for the District of Puerto Rico, Case No. 3:14cr346, of conspiracy to possess with intent to distribute at least five kilograms of cocaine, in violation of 21 U.S.C. § 841(b)(1)(A).  The district court sentenced him on September 9, 2015, to 87 months of imprisonment.  Aponte-Pinto's expected release date, via good conduct time, is February 14, 2022.

Under 18 U.S.C. § 3621(b) & (e), the BOP is required, subject to the availability of appropriations, to make residential substance abuse programs available to eligible prisoners.  The BOP's Residential Drug Abuse Treatment Program ("RDAP") was developed in accordance with this federal mandate to assist federal prisoners in overcoming their substance abuse problems.  Procedures for implementing this voluntary program are set forth at 28 C.F.R. §550.50, *et seq.*, and BOP Program Statement 5330.11, Psychology Treatment Programs (4/25/2016).  To

encourage inmates to participate in the program, the BOP traditionally offered a number of incentives to inmates.  These incentives include financial rewards, consideration for the maximum period of time at a community corrections facility, and local institution incentives such as preferred living quarters.  *See* 28 C.F.R. § 550.57.

If an inmate successfully completes RDAP, the Director of the BOP has discretion to reduce the inmate's sentence by a period not to exceed twelve months. *See* 18 U.S.C. §3621(e)(2)(B); *see also* BOP Program Statement 5331.02 (9/27/2017), Early Release Procedures Under 18 U.S.C. §3621(e).  Federal regulations and Program Statement 5331.02 establish the BOP's criteria and procedures for evaluating an inmate for early release pursuant to § 3621(e)(2)(B) for successful completion of the RDAP.  *See* PS 5331.02.  An inmate is eligible for § 3621(e) early release if, among other things, the inmate successfully completes RDAP, as described in 28 C.F.R. § 550.53.  *See* 28 C.F.R. § 550.55(a)(2).

To successfully complete RDAP, an inmate must complete three components. *See* 28 C.F.R. § 550.53(a); PS 5330.11, Chp. 2, pp. 8–24 (implementing RDAP regulations and providing implementing instructions).  The first component of RDAP is the unit-based component, which involves the inmate completing activities as assigned by drug abuse treatment specialists ("DTS") and the Drug Abuse Program

Coordinator ("DAPC") in a treatment unit set apart from the general prison population. 28 C.F.R. § 550.53(a)(1). Successful completion of the unit-based RDAP component requires (1) satisfactory attendance and participation in all RDAP activities, and (2) passing each RDAP testing procedure. *Id.*, § 550.53(f). This component must be at least six months long, but usually lasts nine to twelve months in order to accommodate the minimum number of treatment hours. PS 5330.11, Chp. 2, p. 8.

The second component, if time allows between completion of the unit-based component of the RDAP and transfer to a community-based program, consists of follow-up treatment for inmates who return to the general population. *See* 28 C.F.R. § 550.53(a)(2); PS 5330.11, Chp. 2, p. 22. An inmate must remain in follow-up treatment for twelve months or until he is transferred to a residential reentry center, whichever comes first. PS 5330.11, Chp. 2. p. 22.

The third RDAP component is Transitional Drug Abuse Treatment ("TDAT"), in which the inmate is transferred to community confinement and must participate in and successfully complete community-based drug abuse treatment. *See* 28 C.F.R. § 550.53(a)(3).

An inmate may be expelled/removed from RDAP by the DAPC because of disruptive behavior related to the program or unsatisfactory progress in treatment. 28 C.F.R. § 550.53(g)(1). Ordinarily, an inmate must be given at least one formal warning before being removed from RDAP. *Id.*, § 550.53(g)(2). But a formal warning is not necessary when the documented lack of compliance with program standards is of such magnitude that an inmate's continued presence would create an immediate and ongoing problem for staff and other inmates. *Id.*

The Program Statement implementing the expulsion and warning regulations provides:

> (a) **Circumstances for an Intervention**. Ordinarily, staff will provide the inmate with at least one treatment intervention prior to removal. However, in response to disruptive behavior or unsatisfactory progress, treatment staff will:
>
> – Meet with the inmate to discuss his or her behavior or lack of progress.
> – Assign the treatment intervention(s) chosen to reduce or eliminate the behavior, or to improve progress.
> – Warn the inmate of the consequences of failure to alter his/her behavior.
> – Properly document in PDS the meeting and treatment intervention(s) assigned.
> – Properly document in PDS changes to the inmate's treatment plan, and ensure that both staff and the inmate sign the amended treatment plan.
> – When appropriate, require the inmate to discuss his or her targeted behavior in the community.

**(b) Circumstances for Expulsion**.  In the event repeated treatment interventions are required in response to inappropriate behaviors or unsatisfactory progress the treatment team will meet to decide if the inmate will be removed from the program.

Within two working days after a decision has been made to expel an inmate, the DAPC will:

–    Verbally notify the inmate of his/her expulsion status.
–    Notify the inmate and appropriate staff in writing of the reason for expulsion through the *Change in RDAP and § 3621(e) Status* form.
–    Update the pertinent SENTRY DRG assignments.
–    Ensure proper documentation of the expulsion has been entered into PDS.

An inmate may not ordinarily be removed immediately by the DAPC without a treatment intervention unless the inmate has committed a prohibited act that jeopardizes the institution and other inmates.

PS 5330.11, Chp. 2, p. 18.

On December 17, 2015, Dennis N. Profitt, Ph.D., the DAPC at FPC-Pensacola, conducted Aponte-Pinto's RDAP eligibility diagnostic interview (*see* Declaration of Dr. Dennis N. Profitt ¶ 9, ECF No. 11-3).  As part of this RDAP screening, Aponte-Pinto signed a consent form (Form BP-A0749) titled, "Agreement to Participate in a BOP Residential Drug Abuse Treatment Program" (*see* Profitt Decl. ¶ 10 and Exhibit B).  The Agreement identified RDAP goals, rules, and polices (*see id.*).  By signing the Agreement, Aponte-Pinto acknowledged his understanding that he was expected

to follow policies, rules, and regulations of the BOP and RDAP (*see id.*).  Aponte-Pinto also acknowledged his understanding that if he failed to do so, he may be expelled from RDAP (*see id.*).  Aponte-Pinto also acknowledged that he read the Agreement or had it read to him, and that he understood and agreed to the rules and regulations for participation in RDAP as described in the Agreement (*see id.*).  The Agreement notified Aponte-Pinto that his expulsion from RDAP would result in his receiving no consideration for early release (*see id.*).

Aponte-Pinto entered the residential component of RDAP in March of 2016, and completed it in November of 2016 (Profitt Decl. ¶ 12).  On November 11, 2016, Aponte-Pinto was enrolled in the follow-up component (*id.*).  Aponte-Pinto was expelled from RDAP on April 24, 2017 (*id.*, ¶¶ 12–17).  Following the expulsion, the Treatment Team made a clinical recommendation that he re-do the residential component of RDAP (*id.*, ¶ 20).  Aponte-Pinto chose not to reapply to the residential component (*id.*, ¶¶ 18, 20).

Aponte-Pinto commenced this habeas action on March 20, 2018 (*see* ECF No. 1).  In his habeas petition, Aponte-Pinto contends the BOP's decision to expel him from RDAP violated his substantive and procedural due process rights.  He also claims the BOP's decision was discriminatory and arbitrary and capricious (*see id.* at

7–8).  As relief, Aponte-Pinto seeks reversal of the BOP's decision, reinstatement to the follow-up component of RDAP (but in a Spanish speaking program), reinstatement of his provisional early release eligibility, and expungement of the RDAP expulsion from his inmate record (ECF No. 1 at 6, 13; ECF No. 16).

II.   ANALYSIS

   A.   <u>Constitutional Claims</u>

      1.   Due Process

Aponte-Pinto argues that the decision to expel him from RDAP violated his due process rights, because he was not given a Formal Warning prior to his expulsion; instead, the Formal Warning and expulsion occurred during the same 20-minute meeting with the Treatment Team on April 24, 2017 (*see* ECF No. 1 at 9–12). Aponte-Pinto further argues that the conduct upon which the expulsion decision was based was minor, and was not of such magnitude that his continued presence created an immediate and ongoing problem for staff and other inmates; therefore, BOP regulations required that he receive a Formal Warning prior to his expulsion (*id.*). Aponte-Pinto argues that prior to the meeting of April 24, 2017, with the Treatment Team, he was not given notice that he was facing expulsion or the loss of his

provisional early release eligibility, and thus had no opportunity to prepare a defense (*id.* at 12).

Respondent contends BOP inmates do not have a constitutionally protected liberty interest in participation in RDAP or the provisional grant of early release under § 3621 (ECF No. 11 at 12–13).

Respondent is correct. To establish a due process violation, a petitioner must have been deprived of a liberty or property interest protected under the Fifth Amendment. *See* Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 59, 119 S. Ct. 977, 143 L. Ed. 2d 130 (1999). An inmate has "no constitutional or inherent right" to be released before the completion of a valid sentence. Greenholtz v. Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1, 7, 99 S. Ct. 2100, 60 L. Ed. 2d 668 (1979). Additionally, inmates have no constitutional right to, or other protected liberty interest in, either participating in RDAP or receiving a sentence reduction for completing such a program. *See* Cook v. Wiley, 208 F.3d 1314, 1322–23 (11th Cir. 2000). Indeed, § 3621(e)(2)(B) provides only that the BOP "may" grant a reduction to a prisoner "convicted of a nonviolent offense," and leaves the decision whether to grant early release to the discretion of the BOP. *See* Lopez v. Davis, 531 U.S. 230, 241, 121 S. Ct. 714, 148 L. Ed. 2d 635 (2001); *see also* 18 U.S.C. § 3621(e)(2)(B). "Because the

§ 3621(e)(2)(B) sentence reduction is left to the unfettered discretion of the BOP, the statute does not create a constitutionally protected liberty interest." Cook, 208 F.3d at 1323; *see also* Olim v. Wakinekona, 461 U.S. 238, 249, 103 S. Ct. 1741, 75 L. Ed. 2d 813 (1983) (finding a prison administrator's discretion to transfer an inmate was "completely unfettered" given that Hawaii's prison regulations placed no substantive limitations on official discretion and thus created no liberty interest entitled to protection under the Due Process Clause); Conlogue v. Shinbaum, 949 F.2d 378, 380 (11th Cir. 1991) (concluding no liberty interest arose from possibility of discretionary grant of incentive good time); Venegas v. Henman, 126 F.3d 760, 765 (5th Cir. 1997) ("The loss of the mere opportunity to be considered for discretionary release [under § 3621(e)(2)(B)] is too speculative to constitute a deprivation of a constitutionally protected liberty interest.").

The BOP's expulsion of Aponte-Pinto from RDAP, resulting in the loss of his provisional eligibility for a sentence reduction, did not violate Aponte-Pinto's rights under the Due Process Clause. *See* Cook, 208 F.3d at 1323.

2.    Equal Protection

Aponte-Pinto claims that his expulsion from RDAP was discriminatory because similarly situated inmates received more favorable treatment than he (*see* ECF No. 1

at 8).  He alleges, "[a] careful analysis of disciplinary actions involving other RDAP members will show a pattern of statistical discrimination that disproportionately affects non-white members of the RDAP community" (*id.*).  Aponte-Pinto alleges other inmates who engaged in more serious misconduct, which affected the health and safety of inmates and for which the offending inmates received disciplinary action, were not expelled from RDAP (*id.* at 10–13).  He further alleges his lack of proficiency in the English language was the reason he was expelled (*see* ECF No. 1 at 12; ECF No. 13 at 11–14, 19–20).

Respondent contends Aponte-Pinto has failed to allege that the BOP discriminated against him based on any constitutionally protected interest, and his conclusory allegations of disparate treatment or discriminatory intent are insufficient to state an equal protection claim (ECF No. 11 at 15).

The Equal Protection Clause of the Fourteenth Amendment requires the government to treat similarly situated people alike.  *See* City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439, 105 S. Ct. 3249, 3254, 87 L. Ed. 2d 313 (1985).  To state a claim under the Equal Protection Clause, a prisoner generally must allege "that (1) he is similarly situated with other prisoners who received more favorable treatment; and (2) his discriminatory treatment was based on some constitutionally

protected interest such as race." Jones v. Ray, 279 F.3d 944, 946–47 (11th Cir. 2001) (internal quotations omitted). Thus, in order to assert a viable equal protection claim, a plaintiff must first make a threshold showing that he was treated differently from others who were similarly situated to him. *See* Nordlinger v. Hahn, 505 U.S. 1, 112 S. Ct. 2326, 2331, 120 L. Ed. 2d 1 (1992); Hendking v. Smith, 781 F.2d 850 (11th Cir. 1986). The plaintiff must also allege that the defendant acted with the intent to discriminate against him. *See* McClesky v. Kemp, 481 U.S. 279, 292, 107 S. Ct. 1756, 1767, 95 L. Ed. 2d 262 (1987); E & T Realty v. Strickland, 830 F.2d 1107, 1113 (11th Cir. 1987). Conclusory allegations or assertions of personal belief of disparate treatment or discriminatory intent are insufficient. GJR Inv., Inc. v. Cnty. of Escambia, Fla., 132 F.3d 1359, 1367–68 (11th Cir. 1998); Coon v. Ga. Pac. Corp., 829 F.2d 1563, 1569 (11th Cir. 1987).

The Equal Protection Clause is also implicated in "class of one" claims. Campbell v. Rainbow City, Ala., 434 F.3d 1306, 1314 (11th Cir. 2006). A "class of one" equal protection claim does not allege discrimination against a protected class, rather it alleges that the plaintiff "'has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" Griffin Indus. v. Irvin, 496 F.3d 1189, 1202 (11th Cir. 2007) (quoting

Village of Willowbrook v. Olech, 528 U.S. 562, 564, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000)).  The same strict "similarly situated" standard applies whether an equal protection claim is brought under a "class of one" theory or a traditional theory of unlawful discrimination. *Id.* at 1204–05.  Indeed, the "similarly situated" requirement must be rigorously applied in the context of "class of one" claims.  *See* Leib v. Hillsborough Cnty. Pub. Transp. Comm'n, 558 F.3d 1301, 1306 (11th Cir. 2009).

The record includes ample evidence of the basis for the BOP's decision to expel Aponte-Pinto from RDAP.  On September 29, 2016, while Aponte-Pinto was in the residential component of RDAP, Aponte-Pinto was challenged to improve his participation (*see* Profitt Decl. ¶ 12).  On October 13, 2016, Aponte-Pinto was issued a Formal Warning and advised that he was expected to "demonstrate the actions of a true agent of change" and to participate in all components of the program in full (*see id.*).

Aponte-Pinto states he was not aware he had received a Formal Warning in October of 2016 (*see* ECF No. 13 at 8).  He acknowledges, however, that he, "along with over 20 other members of the RDAP community, was placed on notice for not sufficiently participating in his and others' treatment in the manner than an RDAP member was expected to participate." (*id.* at 8–9).

On April 18, 2017, Chief Psychologist Mandy Ramsey randomly searched Aponte-Pinto's locker and the lockers of other inmates in the follow-up component of RDAP (*see* ECF No. 1-3 at 2, Bureau of Prisons, Psychology Services, Administrative Contact with an Inmate, dated 04/21/2017). Dr. Ramsey identified the following "concerns" during the search of Petitioner's locker:

> extra pillow
> stuff left on his bed (e.g., coke box, bag)
> bed not made properly
> homemade MP3 player case on a string
> locker was so full that it was hard to open and close

(*see* ECF No. 1-3 at 2, Bureau of Prisons, Psychology Services, Administrative Contact with an Inmate, dated 04/21/2017).

On April 21, 2017, three days after the locker search, Dr. Ramsey reported:

> The inmate [Petitioner] approached me today and asked about his locker being searched. He took responsibility for some of his actions but questioned me about others. He was placed on the call-out today to give himself a personal responsibility pull-up; however, there was an institutional recall so the RDAP community meeting was canceled. The inmate will be placed on the call-out for Monday [04/24/17]. He did accept 4 hours of RDAP community service (extra duty).

(*see* ECF No. 1-3 at 2, Bureau of Prisons, Psychology Services, Administrative Contact with an Inmate, dated 04/21/2017). On April 21, 2017, Dr. Ramsey issued Aponte-Pinto an assignment "due to RDAP violations noted on 04-18-17" (*see* ECF

No. 1-3 at 3, Bureau of Prisons, Psychology Services, Administrative Contact with an Inmate, dated 04/21/2017). The assignment was to complete 4 hours of RDAP community service by May 10, 2017 (*see id.*).

On April 24, 2017, Aponte-Pinto received a Formal Warning (*see* ECF No. 1-3 at 4, Bureau of Prisons, Psychology Services, RDAP-Formal Warning, dated 04/24/2017). The report of Aponte-Pinto's Formal Warning, prepared by Dr. Profitt, stated the following:

> The reader is referred to the Chief Psychologist's BEMR entries from 4/21/17 and 4/24/17 and this writer's entry from 4/24/17 for more information related to the reasons for inmate APONTE-PINTO's current Formal Warning. At first during the Formal Warning, inmate APONTE-PINTO seemed cavalier about the issues being addressed. He was evasive with the Treatment Team's questions, he blamed, mollified and failed repeatedly to accept responsibility for his decision-making and actions. He passively refused to be an active participant in determining what he needs to do in order to reinvest himself in his treatment. He would only provide general answers such as, "I need to use the tools," with no further explanation regarding what tools, how to apply them, and/or why doing so would benefit him. At the very least, he was willing to acknowledge that he had become "relaxed" and that this resulted in failing to utilize the tools for making better, more healthy decisions.
>
> Inmate APONTE-PINTO was informed that he was being expelled from RDAP. He stated, "I don't agree with this." Further, he stated, "I'm getting put out because of a blanket? What about these guys who have tobacco?" Inmate APONTE-PINTO was explained [sic] that by asking that question, he was failing to recognize that it had nothing to do with the decision-making and specific behaviors, but had everything to do

with the irresponsible, dishonest, manipulative, disrespectful, and poorly informed manner in which he responded to having his locker and personal area searched, his self-responsibility pull-up, and his current Formal Warning. All these were opportunities not only for him to learn from, but for him to demonstrate humility, caring, open-mindedness, honesty, and willingness. None of those were chosen, so expulsion with the option of reapplying for RDAP in 90 days from this date is the clinical recommendation. Further, he is recommended to enroll in non-residential drug abuse treatment and anger management group as adjuncts to the RDAP, if he does choose to reapply.

(*see* ECF No. 1-3 at 4, Bureau of Prisons, Psychology Services, RDAP-Formal Warning, dated 04/24/2017).

The BOP's responses to Aponte-Pinto's administrative challenges to the expulsion decision provided further explanation for the Treatment Team's expulsion decision. The warden's response to Aponte-Pinto's formal grievance states the following:

A review of the matter reveals the following. Your expulsion from RDAP follow-up treatment with the recommendation of applying to and successfully repeating residential RDAP prior to being allowed to continue with follow-up treatment was based on your failure to demonstrate knowledge and practice of RDAP treatment tools, not because you violated any particular rules. Specifically, when your rule violations were brought to your attention by staff, rather than accept full responsibility for your own behavior, you chose to challenge the staff member who had discovered the violations. Further, during the self-responsibility pull-up you did for the rule violations, you failed to accept responsibility for your actions, you struggled significantly with applying RDAP treatment tools, and you were found, ultimately, to be lying to staff and the RDAP community because a search of your area

following your pull-up revealed the same rule violations for which you were conducting the pull-up. Consequently, you met with the Drug Abuse Program Treatment Team to be issued a Formal Warning. In spite of receiving this warning from the Team, you continued to demonstrate poor knowledge of the RDAP treatment tools and a gross inability to apply them throughout the remainder of the meeting. Following your Formal Warning, the Team deliberated and concluded that your poor understanding of the treatment concepts and inability and/or unwillingness to apply the treatment concepts were so egregious that allowing you to remain in RDAP follow-up treatment would be clinically irresponsible. It was also this finding that led the Team to strongly recommend redoing residential RDAP. If you choose to do so, you will be afforded the opportunity to learn and practice the treatment concepts you lacked during the aforementioned recent events.

(*see* ECF No. 1-1 at 6, Response to Administrative Remedy ID Number 901073-F3).

Aponte-Pinto appealed the Warden's response to the BOP's Regional Director (*see* ECF No. 1-1 at 9, Regional Administrative Remedy Appeal No. 901073-R1). The Regional Director denied the appeal, noting, "In the final analysis, the clinical team unanimously concluded you did not have the knowledge, skills, and motivation toward lifestyle change commensurate with someone who had received treatment for well over a year." (*id.*). Aponte-Pinto appealed to the Administrator of National Inmate Appeals (*see* ECF No. 1-1 at 11, Administrative Remedy No. 901073-A2). The national Administrator denied the appeal (*id.*).

The basis for Aponte-Pinto's expulsion are reiterated by Dr. Profitt in his declaration submitted by Respondent in this habeas case. Dr. Profitt states:

12. Mr. Aponte-Pinto entered the unit-based treatment component of RDAP at FPC Pensacola in March 2016, and completed the residential portion in November 2016. While he was in the residential portion, on September 29, 2016, Mr. Aponte-Pinto was challenged to improve his participation. He was issued a Formal Warning on October 13, 2016, and advised the expectation was that he would demonstrate the actions of a true agent of change, and he would participate in the program in full. This included all components of the program.

13. After Mr. Aponte-Pinto showed he was progressing in the unit-based portion of RDAP, he was enrolled in the follow-up component on November 11, 2016.

14. On April 24, 2017, while in the follow-up component of the program, Petitioner was provided another Formal Warning, during which he engaged in several violations of the RDAP treatment tools and concepts, which ultimately led to his expulsion later that same day. The problems that led to Petitioner's expulsion were his continual disrespect of staff, and his aggression towards staff, as well as his demonstrated contempt for the program and its staff. Petitioner maintained a cavalier attitude toward the efforts being made to correct his decision-making and problematic behaviors, and after a search of his locker, he threw over 30 magazines (at one time angrily) at the feet of a staff member.

15. Mr. Aponte-Pinto's belief that his actions were not egregious enough to merit receipt of an incident report, and subsequent expulsion, exhibits his failure to comprehend the teachings of the RDAP program. An inmate having received an incident report, in and of itself may not result in expulsion. The determination to expel an inmate from RDAP lies in the hands of the DAPC and treatment team. The DAPC and treatment team manage the misbehavior from a clinical perspective. We are more concerned with the participant's response to their misbehavior, and not always with the offense being committed.

16. We anticipate participants to make bad decisions with a variety of consequences. The participant's response to their actions will show the staff whether they are familiar with the treatment concepts and tools of the program. If an inmate accepts responsibility by holding themselves accountable or when being held accountable and they show are [sic] motivated towards better decision making, then we consider this as a demonstration the participant has learned from the program and is moving towards positive changes in their life.

17. In Mr. Aponte-Pinto's case, he maintained a cavalier attitude toward the sequence of offenses he committed and had the attitude that his behavior was not that bad. This exhibited his lack of acceptance of accountability and a poor understanding of the treatment concepts. We believed that based on Mr. Aponte-Pinto's sequence of failures to implement tools that he had demonstrated having learned in the residential component of the program; the only responsible thing was for him to start the residential component over again. This would have provided him with another opportunity to learn and practice the knowledge and skills he continued to show significant deficit in during his follow-up treatment.

(Profitt Decl. ¶¶ 14–17).

With respect to the "similarly situated" element of both types of equal protection claims (i.e., the traditional type and the "class of one" type), Aponte-Pinto cites three examples of comparator inmates who received more favorable treatment than he:

For example, inmate Jay Mayne, Reg. No. 76558-004, was not expelled from the RDAP program and did not lose his one year early release benefit even though he was removed from the general population and

taken to the Santa Rosa County Jail for investigation of a Prison Rape Elimination Act (PREA) complaint and then removed again from the general population and taken to the Santa Rosa County Jail after having been found guilty of the serious disciplinary violation of smoking and possessing a lighter.

In addition, inmate Tony Bailey, Reg. No. 15701-042, was not expelled from the RDAP program and did not lose his one year early release benefit even though he was removed from the general population and taken to the Santa Rosa County Jail after having been found guilty of possessing a cell phone.  Inmate Bailey was returned to the general population and did not lose his one year early release benefit despite being found guilty of the most serious disciplinary violation/incident report.

Likewise, inmate Luis Carlos, Reg. No. 10425-003, was not expelled from the RDAP program and did not lose his one year early release benefit even though he was removed from the general population and taken to the Santa Rosa County Jail after having been found guilty of possessing a cell phone.  Inmate Carlos was returned to the general population and did not lose his one year early release benefit despite being found guilty of the most serious disciplinary violation.

(*see* ECF No. 13 at 19–20).

Aponte-Pinto has failed to show he was similarly situated with the comparators he identified.  Aponte-Pinto has not shown that any comparator's response to the allegations of misbehavior was similar to his; specifically, he has not shown that any comparator failed to demonstrate knowledge and practice of RDAP treatment tools, for example, by accepting responsibility for the behavior by holding themselves

accountable or, when being held accountable, showing they are motivated towards better decision making.

Not only has Aponte-Pinto failed to satisfy the "similarly situated" requirement of both types of equal protection claims, he also has not satisfied the intent requirement. Aponte-Pinto does not allege that any BOP official involved in the expulsion decision acted with the intent to discriminate against him.

Additionally, with respect to a traditional equal protection claim, Aponte-Pinto has failed to show that the allegedly discriminatory treatment was based on a constitutionally protected interest. Aponte-Pinto argues that the decision to expel him was a result of his difficulty with the English language (*see* ECF No. 13 at 11–14, 18, 25; ECF No. 16 at 4).

Immutable characteristics determined solely by the accident of birth such as race, national origin, and gender are typically the basis for finding a suspect class. *See* Frontiero v. Richardson, 411 U.S. 677, 93 S. Ct. 1764, 36 L. Ed. 2d 583 (1973); Williams v. Pryor, 240 F.3d 944, 947 (11th Cir. 2001). Language and national origin are not interchangeable. *See* Mumid v. Abraham Lincoln High School, 618 F.3d 789 (8th Cir. 2010). Language is not an immutable characteristic and, by itself, does not identify members of a suspect class. *See* Soberal–Perez v. Heckler, 717 F.2d 36, 41

(2d Cir. 1983); <u>Olagues v. Russoniello</u>, 770 F.2d 791 (9th Cir. 1985) (same); *see also*

<u>Mumid</u>, 618 F.3d at 789 (policy that treats students with limited English proficiency

differently than other students does not facially discriminate based on national origin

in civil rights action).[1]

Furthermore, Aponte-Pinto's conclusory allegation that "[a] careful analysis of

disciplinary actions involving other RDAP members will show a pattern of statistical

---

[1] Moreover, Dr. Profitt states that Aponte-Pinto was screened for the Spanish RDAP on December 2, 2015, and on December 4, 2015, Aponte-Pinto requested to be considered for the English RDAP at FPC-Pensacola (*see* Profitt Decl. ¶ 6). Dr. Profitt states he asked Aponte-Pinto to read from the RDAP Orientation module book (*id.* ¶ 7). Profitt states Aponte-Pinto was able to read the book and show comprehension by explaining the materials in his own words, which demonstrated to Dr. Profitt that Aponte-Pinto could manage the rigors of the program (*id.*). Dr. Profitt additionally states that the English as a Second Language teacher at FPC-Pensacola endorsed Aponte-Pinto's abilities to participate in the RDAP program in English, and only expressed a concern about Aponte-Pinto's writing skills (*id.* ¶ 8). Dr. Profitt states that for purposes of RDAP, the writing skills are not a concern so long as the participant is able to read and comprehend, and the treatment providers are able to decipher the participant's writing (*id.*). Dr. Profitt states that he conducted Aponte-Pinto's eligibility diagnostic interview on December 17, 2015, and he did so in English (*id.* ¶ 9). Dr. Profitt states that during such interviews, he asks the applicant questions in English and types the applicant's verbatim responses into the computer system (*id.*). Dr. Profitt states Aponte-Pinto answered the questions in English "with no trouble at all." (*id.*).

Aponte-Pinto states he requested permission to participate in the Spanish RDAP program at another BOP institution, for example, in Miami, because it was not offered at FPC-Pensacola (*see* ECF No. 13 at 11, 13). Aponte-Pinto states he told Dr. Profitt that he could understand and speak English "to some degree," but he could not read or write in English (*id.* at 11). Aponte-Pinto attached the results of "CASAS testing," which showed he scored 225 in reading and 217 in listening comprehension (*id.* at 11, 40). Aponte-PInto states both of these scores are one point above the minimum (*id.* at 11). Aponte-Pinto states Dr. Profitt told him that "his name had come up on the list," and if he did not take RDAP in English at FPC-Pensacola, he would have to wait over 5 years to take the Spanish program, because an opening would not be available until then (*id.* at 11, 13–14). Aponte-Pinto states there would be no early release benefit if he waited that long (*id.* at 13–14). Aponte-Pinto states that Dr. Proffit's comment that he could answer questions in English "with no trouble at all" is "a bit of an exaggeration [sic]" (*id.*).

discrimination that disproportionately affects non-white members of the RDAP community" (ECF No. 1 at 8) is insufficient to state a claim of discrimination based upon a disparate impact theory.  Therefore, Aponte-Pinto has failed to show that the BOP's decision to expel him from RDAP was discriminatory under the traditional equal protection analysis.  *See* <u>Santiago-Lebron v. Fla. Parole Comm.</u>, 767 F. Supp. 2d 1340, 1349–50 (S.D. Fla. 2011).

Aponte-Pinto's claim of discrimination also fails under the "class of one" analysis.  As previously discussed, Aponte-Pinto must allege not only that he was intentionally treated differently from others similarly situated, but also that there was no rational basis for the difference in treatment.  Here, Dr. Profitt's declaration states a rational basis for the BOP's expulsion decision, namely, that Aponte-Pinto's attitude exhibited a poor understanding of RDAP treatment concepts and a failure to implement and practice the knowledge and skills he learned in the residential component of RDAP.

For these reasons, Aponte-Pinto has not shown that the BOP's decision to expel him from RDAP violated the Equal Protection Clause.

    B.    <u>Review of Agency Decision for Abuse of Discretion</u>

Aponte-Pinto and his counsel argue that the BOP's expulsion decision is arbitrary and capricious, an abuse of discretion, based upon false and inaccurate information, unsupported by evidence, and disproportionate to the misconduct of which he was accused (*see* ECF No. 1 at 8; ECF No. 13 at 2–5; ECF No. 16 at 2–5).[2] Aponte-Pinto and his counsel also argue that Dr. Profitt's characterization of Aponte-Pinto's behavior and attitude as "cavalier," "disrespectful," and "aggressive" was erroneous (ECF No. 16 at 4–5).

The standards of review cited by Aponte-Pinto and his counsel (i.e., arbitrary and capricious, abuse of discretion, etc.) are applicable to judicial review of decisions of federal administrative agencies under the Administrative Procedures Act ("APA"). *See* 5 U.S.C. § 706. Under the APA, a reviewing court must set aside agency

---

[2] Aponte-Pinto and his counsel make the following specific arguments. They contend that the reasons for expulsion provided by Dr. Profitt (i.e., Aponte-Pinto's "sequence of failures" including "his continual disrespect of staff, and his aggression towards staff, as well as his demonstrated contempt for the program and its staff") were not supported by any evidence. They argue that Dr. Profitt's declaration is devoid of specifics as to which staff member Aponte-Pinto was disrespectful to and when (ECF No. 16 at 2). They additionally contend that Aponte-Pinto's alleged misconduct, i.e., throwing thirty magazines at the feet of a staff member, was not witnessed by Dr. Profitt (*see id.* at 3). Aponte-Pinto and his counsel further argue that Dr. Profitt's characterization of Aponte-Pinto's attitute and conduct is refuted by Aponte-Pinto's exceptional behavior, which is documented in the letters of support from current and former FPC-Pensacola staff members, attached to Aponte-Pinto's Reply (*see* ECF No. 13, Exhibit 5; ECF No. 16 at 4–5). Aponte-Pinto and his counsel additionally argue that the punishment of expulsion from RDAP, and the resulting loss of eligibility for a one-year sentence reduction, was disproportionate to his alleged misconduct (*see* ECF No. 16 at 3).

decisions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

Respondent contends the judicial review provisions of the APA are inapplicable to the BOP's expulsion decision, pursuant to 18 U.S.C. § 3625 (ECF No. 11 at 13–14).  Therefore, Aponte-Pinto's arguments that the BOP's decision was arbitrary or an abuse of discretion provide no basis for habeas relief (*id.*).

Respondent is correct.  Section 3625 of Title 18 provides that the APA sections governing judicial review (5 U.S.C. §§ 701–706), do not apply to "the making of any determination, decision, or order under this subchapter."  18 U.S.C. § 3625.  "This subchapter," i.e., Subchapter C of the Postsentence Administration statute, includes Section 3621, which confers upon the BOP authority to administer and design drug treatment programs such as RDAP.  *See* 18 U.S.C. §§ 3621, 3625; Cook, 208 F.3d at 1319.

Where judicial review under the APA is specifically excluded by statute, the United States Supreme Court has found that two questions are still appropriate for judicial review:  (1) whether any cognizable constitutional claim has been presented; and (2) whether the agency's interpretation of the statute is contrary to well-settled law.  *See* Santiago-Lebron, 767 F. Supp. 2d at 1351 (citing Webster v. Doe, 486 U.S.

592, 108 S. Ct. 2047, 100 L. Ed. 2d 632 (1988) and <u>Neal v. United States</u>, 516 U.S.

284, 116 S. Ct. 763, 133 L. Ed. 2d 709 (1996)).

As set forth *supra*, Aponte-Pinto has failed to present any cognizable

constitutional claim.  Further, he has not shown that the BOP's interpretation of

§ 3621 is contrary to established federal law, or that the expulsion decision exceeded

the BOP's statutory authority.  Therefore, Aponte-Pinto's challenges to the BOP's

individualized decision to expel him from RDAP, on the ground that it was arbitrary,

capricious, an abuse of discretion, etc., are foreclosed by § 3625.[3]  *See* <u>Standifer v.

Ledezma</u>, 653 F.3d 1276, 1279 n.3 (10th Cir. 2011) ("To the extent Standifer

challenges only the BOP's decision regarding his eligibility for RDAP participation,

his argument is expressly foreclosed by 18 U.S.C. § 3625, which prohibits judicial

review under the APA of RDAP placement decisions.") (citing <u>Hunnicutt v. Hawk</u>,

229 F.3d 997, 1000 (10th Cir. 2000)); <u>Reeb v. Thomas</u>, 636 F.3d 1224 (9th Cir. 2011)

("To find that prisoners can bring habeas petitions under 28 U.S.C. § 2241 to

challenge the BOP's discretionary determinations made pursuant to 18 U.S.C. § 3621

---

[3] Petitioner cites <u>Sacora v. Thomas</u>, 648 F. Supp. 2d 1218 (D. Or. 2009) in support of his argument that § 3625 does not preclude review of the BOP's expulsion decision (*see* ECF No. 13 a 26–29; ECF No. 16 at 5).  However, the decision of the District Judge in <u>Sacora</u> was disagreed with by another District Judge in the same district court, albeit in an unpublished decision.  *See* <u>Johnston v. Thomas</u>, No. CV 09-1096-MO, 2010 WL 2574090, at *5 (D. Or. 2010) (unpublished).

would be inconsistent with the language of 18 U.S.C. § 3625."); *see also* <u>Santiago-Lebron</u>, 767 F. Supp. 2d at 1352; *see also, e.g.*, <u>Gaddis v. Taylor</u>, No. 1:15-cv-01155-VEH-TMP, 2018 WL 3800248, at *6 n.13 (N.D. Ala. July 9, 2018) ("To the extent Gaddis contends that BOP's decision to expel him from the RDAP was arbitrary, the 'arbitrary and capricious' standard of review ordinarily applicable to decisions of administrative agencies under the Administrative Procedures Act ('APA') is not implicated, as decisions applying § 3621 are explicitly excepted from coverage under the APA."), *Report and Recommendation Adopted by* 2018 WL 3772850 (N.D. Ala. Aug. 9, 2018).

III.    CONCLUSION

Aponte-Pinto has failed to demonstrate that his expulsion from RDAP violated his rights under the Constitution or federal law. Therefore, he is not entitled to habeas relief.

Accordingly it is respectfully **RECOMMENDED**:

That the petition for writ of habeas corpus filed under 28 U.S.C. § 2241 (ECF No. 1) be **DENIED**.

At Pensacola, Florida this <u>19</u><sup>th</sup> day of November 2018.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of objections shall be served upon all other parties.   If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.